Jeffery Eugene RABY, Plaintiff,

v.

BAPTIST MEDICAL CENTER, Ed Alford, Robert D. Mangum, R.D. "Reggie" Bridges, Michael Doty, and Mike DeBoer, Defendant.

No. Civ.A. 97–A–984–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 9, 1998.

---

Joseph B. Lewis, Montgomery, AL, for Plaintiff.

Joseph C. Espy, James E. Williams, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by the Defendants on June 18, 1998 (Doc # 54).

The Plaintiff originally filed his Complaint in this case on June 25, 1997, but has filed three Amended Complaints subsequent to his original Complaint. The Plaintiff brings claims for assault (Count I), battery (Count II), negligence (Count III), negligence per se (Count IV), negligent battery (Count V), negligent hiring, training, retention, and supervision (Count VI), deprivation of civil rights under color of state law (Count VII), outrage (Count VIII), respondeat superior (Count IX), wanton and willful conduct (Count X), and Defamation per se (Count XI).

For the reasons to be discussed, the Motion for Summary Judgment is due to be DENIED in part and GRANTED in part on Raby's § 1983 claims. The court will address the Motion for Summary Judgment as to the state law claims brought by Raby in a separate Order entered on this date.

### II. FACTS

The submissions of the parties establish the following facts construed in a light most favorable to the non-movant:

The Plaintiff, Jeffery Raby ("Raby"), has brought claims based on events which occurred when he was arrested by Baptist Medical Center police officers. Although Baptist Medical Center is a private organization, the Alabama Legislature has passed, and the Governor approved, an Act by which Baptist Medical Center is given the authority to appoint police officers. *See* Ala. Acts 1996, No. 96–518. Any person appointed by Baptist Medical Center under this Act "shall be charged with all the powers of state or municipal police officers including, but not limited to, the right to bear firearms." *Id.*

On the day in which the events in this case transpired, Raby's car was parked in the parking lot of Montgomery Cardiovascular Institute (MCI) near the Easter Seals Center.[1] Raby entered the Easter Seals Center and while he was inside, Defendant R.D. "Reggie" Bridges ("Bridges"), a Baptist Medical Center police officer, noted the license number on Raby's car. When Raby emerged from the Easter Seals Center, Bridges demanded identification, and Raby complied with his request. He then radioed the information in and was told that Raby should be arrested for trespassing because of a court order stemming from a prior trespassing conviction. When Bridges attempted to arrest Raby, Raby got into his car and locked the doors. Bridges placed his sidearm in the gap at the top of the driver's side window and demanded that Raby emerge from the vehicle.

Robert D. Mangum ("Mangum"), also a Baptist Medical Center police officer, subsequently arrived on the scene. Mangum attempted to break the driver's side window with his baton while Bridges attempted to unlock the passenger's side door. The evidence is then contested as to Mangum's next actions. Mangum moved either directly in front of or to the side of Raby's car and shot him through the windshield, either as or before Raby drove off. The officers then chased Raby to the Easter Seals Center[2] where they, and an additional officer named Michael Doty ("Doty") pinned him on the floor, struck him, and handcuffed him. Raby was subsequently admitted to Baptist Medical Center for treatment of his injuries. Raby also contends that he was libeled by the publication of newspaper accounts of the shooting.

---

1. Raby has devoted a substantial portion of his brief to an argument that his arrest for trespass and resisting arrest were improper. Regardless of whether these contentions have any bearing on the claims at issue, the convictions for trespass and of resisting arrest are res judicata in this case. *See Meadows v. Evans*, 550 F.2d 345, 350 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 517, 54 L.Ed.2d 457 (1977).

2. The Defendant states in brief that Raby was actually apprehended in the Wise Office Building which is connected to the Easter Seals Center. Since the deposition evidence refers to the Easter Seals Center and Raby refers to the building as the Easter Seals Center, the court has also referred to the building as the Easter Seals Center.

### III. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### IV. *DISCUSSION*

Because some of the Baptist Medical Center police officers involved in this case participated directly in the events which transpired, while others allegedly established the policies or customs pursuant to which these officers acted, the court will separately address the liability of the officers. The court will then separately address the application of qualified immunity to the acts of these officers.

#### A. Violation of Raby's Constitutional Rights—County VII

 While Raby has not specifically explained the civil rights he contends were violated by the actions of the Baptist Medical Center officers, "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard ..." *Toth v. City of Dothan*, 953 F.Supp. 1502, 1510 (M.D.Ala.1996) (quoting *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The court will, therefore, analyze Raby's claim under Count VII as a Fourth Amendment claim under 42 U.S.C. § 1983.[3]

---

**3.** There has been no argument made in this case that the Defendants should not be considered to be state actors for purposes of liability under § 1983. In fact, the Defendants argue that they are state actors. *See* Defendants' Brief in Opposition to Summary Judgment, page 20. Evidence has been provided to the court which indicates that the State gave Baptist Medical Center the authority to hire police officers and that these officers have "all the powers of state or municipal police officers." Acts of Alabama, 1996, No. 96–518. Therefore, while the parties cannot concede subject matter jurisdiction, since

none of the parties contest or refute this evidence, the court finds that there is sufficient evidence from which to draw the conclusion that there was state action. *See Skelton v. Pri–Cor, Inc.*, 963 F.2d 100 (6th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1682, 118 L.Ed.2d 398 (1992); *United States v. Hoffman*, 498 F.2d 879, 881 (7th Cir.1974) (privately employed railroad policeman acted under color of state law where "authorized on a continuing and full-time basis to search actively for criminals and trespassers and to use the powers of the state when their search is successful.").

### 1. Mangum's Alleged Violation of Raby's Rights

Raby seeks to hold Mangum liable based on his direct participation in the shooting and subsequent arrest of Raby. He contends that in shooting Raby and in struggling with Raby and punching him in the face, Mangum used an unreasonable amount of force.

When Mangum shot Raby, Raby was seated in his car and Mangum and Bridges had been attempting to arrest Raby for trespassing. In *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court set forth parameters within which a police officer can lawfully use deadly force against a fleeing felon. Under *Garner*, the use of deadly force to apprehend a fleeing suspect who does not appear to be armed or otherwise dangerous violates the suspect's rights under the Fourth Amendment to be free from unreasonable seizure. *Id.* at 21, 105 S.Ct. 1694. The Eleventh Circuit has described the requirements for using deadly force identified by the Supreme Court as being that the officer must have probable cause to believe the suspect poses a threat of serious physical harm to the officer or to others; deadly force must be necessary to prevent escape, and the officer must give some warning regarding the possible use of deadly force whenever feasible. *Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir.1985).

■■■ In deciding whether a particular seizure is reasonable, reasonableness "is to be determined by 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1502 (11th Cir.1985) (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). Proper application of this test requires "careful attention to the facts and circumstances of each particular case ..." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness of any particular seizure is also "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. In determining whether a given seizure is reasonable the court must make "allowance for the fact that police officers are often called upon to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. The test of reasonableness is an objective one so the underlying motivation of the officer is irrelevant. *Id.*

■■■ The Defendants have argued that Mangum acted reasonably because he reasonably thought that Raby posed a threat of immediate harm. In support of this argument, the Defendants state that Mangum saw Bridges with his gun drawn, that the suspect would not come out of the car, that the car had black draping over the windows, that the car was backed into a parking space, that the officers were standing beside the car, that Mangum was standing in front of the car at the time the gun was fired, that Mangum was in motion from either avoiding the car or from being hit at the time the shot was fired, that the car jumped out of the parking space and sped into a nearby parking lot, and that Mangum was struck by the car. Mangum specifically testified to the events preceding the shooting, stating that he was walking around the front of Raby's car, that he heard the engine rev, and he looked through the windshield to see Raby putting the car in gear, and as he jumped out of the way, or as he was hit by the car, he shot his gun into the car. Mangum Deposition, at pages 106–09.

In addition to the officers' statements as to the events which occurred, the Defendants have also provided the affidavits of eyewitnesses and an affidavit from an expert witness. The expert witness offers the opinion that the trajectory of the bullet indicates that it was shot in a manner that is consistent with Mangum's testimony that he shot at the car while moving to get out of the way. Affidavit of Ken Kataris. Eyewitnesses said that they heard tires squealing, a gun shot, and that they heard a gun shot as they saw an officer falling. *See e.g.,* Affidavit Jennifer McCartha; Affidavit of Debra Blevins.

The Defendants argue that Mangum's shooting of Raby was necessary given that Raby was using a car to resist arrest and posed a risk of serious bodily injury to Offi-

cer Mangum and bystanders in the parking lot. The Defendants cite this court to two decisions which they contend confirm the objective reasonableness of Mangum's actions. In *Fraire v. City of Arlington,* 957 F.2d 1268 (5th Cir.1992), a police officer chased a car into a cul-de-sac where the car stalled. The police officer approached the car on foot, whereupon the car started and began driving around the cul-de-sac and then sped towards the officer. The court held that the officer had cause to believe that he was under threat of serious harm to himself and others and was constitutionally permitted to use deadly force. *Id.* at 1276. In *Smith v. Freland,* 954 F.2d 343 (6th Cir.), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1954, 118 L.Ed.2d 557 (1992), a police officer parked his car in front of a suspect's car. The suspect drove forward, smashing into the officer's car and then smashed into a fence. The officer shot into the car as it drove past. The district court rejected the argument that the officer was acting in self-defense, but held that the force was justified due to the threat of injury to others. The Sixth Circuit affirmed, holding that the suspect posed a danger to officers manning a roadblock down the street. *Id.* at 347.

 Raby has provided his own deposition testimony to dispute the facts offered by the Defendants.[4] The Defendants argue that this court should hesitate to consider such evidence because Raby is incompetent to testify. The Defendants point out that Raby stated in his deposition that he is George Washington. Although concerns over Raby's competence may be appropriately addressed at trial, given that the Defendants' concerns over Raby's competence were not raised until the Defendants' Reply Brief so that Raby has not had the opportunity to respond to those concerns, this court cannot conclude that Raby's testimony should not be considered at this point in the proceedings. *See United States v. McRary,* 616 F.2d 181 (5th

Cir.1980) (district court should have afforded the opportunity to make a proffer and a record to determine the witness' ability to testify)[5]. The court stresses, however, that its consideration of Raby's deposition testimony for summary judgment purposes does not mean that the court has, or has not, determined Raby to be a competent witness.

Raby contests the Defendants' evidence as to the chronology of events which occurred relative to the shooting. Raby testified that he started his car and then Mangum ran to the front left side of the car, turned and aimed the gun at him, and fired the gun. Raby Deposition, page 193, lines 8–14. Raby also stated that it was only **after** he had been shot that he put the car in gear and drove off. Raby Deposition, page 194, lines 14–23.

In addition to this testimony, Raby points out that on the day of the incident, Mangum stated that the car had narrowly missed him, not that it hit him. Crew Deposition, page 24, lines 3–10. Raby has also provided photographic evidence of a wooden dowel placed in the bullet hole in the car windshield which he contends establishes that the expert testimony of the bullet trajectory is faulty. Raby contends that for the bullet to have come from where Mangum claims he was standing, he would have had to have fired from over seven feet above the ground, but that Mangum is 6'3" tall. Plaintiff's Exhibit 23. The Defendants contend that this evidence is irrelevant because Mangum never claimed to be in front of the car at the time that he shot the gun, but that he was moving out of the way of the moving car. However, Raby's evidence, whatever its weight may ultimately be at trial, has apparently been offered to show that Mangum was not as close to the car as he testified, nor near the front, but rather was three feet away from the car near the driver's side wheel well. The Defendants also contend that Raby's statements in brief that at most Raby's car "narrowly missed"

---

4. Other evidence offered by Raby, which tends to corroborate his own version of some of the relevant events, comes from police reports of eyewitness statements. The Defendants have challenged the admissibility of this evidence, arguing that the court should not consider it in deciding the summary judgment motion. *See McMillian v. Johnson,* 88 F.3d 1573 (11th Cir.1996). Because the court finds that Raby's deposition testi-

mony is sufficient to create a question of fact, the court need not reach this issue.

5. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Mangum indicate that Mangum was reasonable in fearing for his own safety. However, Raby's statements are not inconsistent with his evidence that Mangum shot him and then Raby drove off, narrowly missing Mangum as he drove off once the shot had been fired.

The two versions of the events presented by the evidence, therefore, are (1) Mangum ran to the front of the car and then shot Raby before Raby put the car in gear, or (2) Mangum was in front of the car, saw the car being put in gear, the car began to move, and then Mangum shot. Because the evidence provided by Raby calls into question the Defendants' evidence that Raby's car was in motion and heading toward Mangum when Mangum fired at the car, the cases and arguments relied on by the Defendants do not entitle the Defendants to summary judgment. The cases cited by the Defendants to establish that a vehicle driven by a suspect can be considered a threat to the officer or others occurred within the context of moving vehicles. In other words, there was not just a potential threat, but an actual threat posed by a moving vehicle.

To have been a reasonable seizure, therefore, Mangum's belief that he or others were endangered must be objectively reasonable in light of the fact that the car was stationary. The standard announced by the Supreme Court and applied by the Eleventh Circuit indicates that if a suspect threatens an officer, deadly force may be used if necessary. *Acoff,* 762 F.2d at 1547. In this case, the disputed facts call into question whether Mangum had a reasonable belief that he or others were in danger. While Raby turned his car on, the facts are in dispute as to whether he had even placed his car in gear before the shot was fired. In fact, since Raby's evidence is that the car was merely turned on, but was not even in gear, Mangum may not have even been reasonable in believing that Raby was about to flee before the shot was fired. Consequently, under the disputed facts presented by the evidence, a reasonable officer could not conclude that Raby was a fleeing felon against whom deadly force could be used. *See Estate of Starks v. Enyart,* 5 F.3d 230 (7th Cir.1993) (holding that reasonableness of deadly force would depend on jury's determination of whether the officer stepped in front of the moving car

or if the officer was in the path of the car before it started moving). Furthermore, there is no evidence in the record to suggest that Mangum would have been reasonable in believing that Raby posed a threat to others, such as bystanders. Raby was sitting in a car which had not been placed in gear and there is no evidence to suggest that Raby had previously driven in a dangerous manner. *See Donovan v. City of Milwaukee,* 17 F.3d 944 (7th Cir.1994) (expressing doubt that suspect imperiled anyone since and distinguishing case from a decision in which fleeing driver had swerved toward officer's car and had driven through lawns, fences, and gates). Accepting all of Raby's evidence as true, and drawing all inferences in his favor, this court cannot conclude that Mangum reasonably believed that a suspect sitting in a parked, running car was fleeing and posed an immediate threat of harm to Mangum or others.

■ Raby also argues that Mangum engaged in a use of unreasonable force inside the Easter Seals Center. Raby claims that Mangum threw him through a glass partition and then hit him in the face at least three times while inside the Easter Seals Center. Raby states that when Mangum punched Raby in the face, he was lying on glass from the shattered partition and could have been injured worse than he was. Raby also points to the testimony of Doty who said that while Mangum's actions were consistent with Baptist Medical Center police policy, he did not think Raby had to be struck in order to be subdued. Doty Deposition, page 23.

The Defendants argue that Mangum acted reasonably in apprehending Raby in the Easter Seals Center because Raby refused repeated demands to get down, resisted Mangum's attempts to put him on the ground to be handcuffed, and even after three officers managed to put Raby on the ground, he still refused to let the officers handcuff him. The Defendants contend that the use of force was necessary and was not unreasonable since the fact that no evidence has been presented of injuries to Raby from his apprehension in the Easter Seals Center undermines a finding that unreasonable force was used.

Within the context of an Eighth Amendment excessive force claim, the Supreme Court has held that there is no requirement that an inmate prove that he suffered "serious injury." *See Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). This does not mean, however, that objective unreasonableness can be shown without a showing of some injury. *See Austin v. Hopper,* 15 F.Supp.2d 1210 (M.D.Ala.1998). In fact, the Eleventh Circuit continues to analyze Fourth Amendment claims of excessive force in terms of whether the injuries sustained and the amount of force applied indicate that the force was excessive. *See Gold v. City of Miami,* 121 F.3d 1442 (11th Cir. 1997); *Robinson v. Brown,* 987 F.Supp. 1470, 1474 (S.D.Fla.1997).

The only evidence that the court has of the amount of force that Mangum used is that a glass partition was broken and Raby's use of the words "punched" and "slugged" to describe how Mangum struck him. *See Griffin v. City of Clanton,* 932 F.Supp. 1359, 1368 (M.D.Ala.1996) (connotation of the word "slam" is evidence of force used). Although the broken partition and use of the particular words to describe the manner in which Raby was hit may be sufficient to conclude that more than minimal force was used, that does not mean that the force used was unreasonable. *See Rambo v. Daley,* No. 92–C–780, 1994 WL 494778 at *2 (N.D.Ill. Sept. 8, 1994) (recognizing that some punches can be within the range of force that a competent officer would have thought reasonable). Raby's argument with respect to injury was that subduing him on the floor where the glass had fallen **could have** caused him to be more injured than he was, but provides no evidence that these actions in fact resulted in any injury. Raby's Brief in Response to the Motion for Summary Judgment, page 21. In fact, although Raby sets out a separate section in his brief listing injuries, the only injuries identified by Raby are bullet holes which resulted from the shooting. *Id.*

Given that Raby had resisted arrest by getting in his car; had driven off from the officers; then had resisted arrest inside the building, even once the officers attempted to subdue him by holding him down; and given that there is no evidence of any injury from which to conclude that the force used was

excessive, the court concludes that Mangum did not engage in an unreasonable use of force in his actions inside the Easter Seals Center. *Cf. Matasic v. City of Campbell, Ohio,* 954 F.Supp. 156 (N.D.Ohio 1997) (officers faced with potential felon who fled in an automobile and created a danger to others were not unreasonable if they hit the suspect and placed a foot on his neck as he was being handcuffed); *Melton v. Shivers,* 496 F.Supp. 781 (M.D.Ala.1980) (defendant who struggled against officers, who had physical prowess, who grabbed for officer's gun and who it took four men to subdue did not have rights violated where was hit in the head several times with the barrel end of a pistol and where was struck in the face with a fist). Therefore, while Raby has created a question of fact as to the excessive use of force by Mangum in shooting Raby, he has not created a question of fact sufficient to defeat summary judgment as to Mangum's actions in apprehending Raby in the Easter Seals Center.

### 2. Bridges' and Doty's Alleged Violation of Raby's Rights

Raby argues that Bridges' pointing of a gun at Raby through his partially opened car window constituted an unreasonable use of force and that Bridges' and Doty's actions in the Easter Seals Center also constituted an unreasonable use of force.

As to Bridge's actions in sticking his pistol through the window of Raby's car and pointing it at his head, the court is persuaded by the reasoning of courts which have found that where "the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution." *Wilkins v. May,* 872 F.2d 190, 193 (7th Cir.1989) (within the context of a fourteenth amendment excessive force claim), *cert. denied,* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990); *see also Johnson v. Grob,* 928 F.Supp. 889 (W.D.Mo.1996) (stating that an officer's pointing a gun during a valid stop is not unreasonable per se). In *Courson v. McMillian,* 939 F.2d 1479 (11th Cir.1991), the Eleventh Circuit cited with approval a Fifth Circuit decision in which the court distinguished between the display of force with a condition-

al threat to use force and the present use or attempted use of force in finding that merely pointing a gun was not grossly disproportionate to the need for action under the circumstances. *See id.* at 1495 n. 26 (citing *Hinojosa v. City of Terrell, Texas,* 834 F.2d 1223 (5th Cir.1988)). Similarly, in this case, there is no evidence that Bridges did more than display force by holding his weapon at Raby's car window. In addition, as previously discussed, in determining whether the use of force was reasonable, the presence of some physical injury is relevant to the determination. *Griffin v. City of Clanton, Alabama,* 932 F.Supp. 1359, 1368 (M.D.Ala. 1996); *cf. Sheth v. Webster,* 145 F.3d 1231 (11th Cir.1998) (apparently including no discussion of injury because it was so clear that there was a complete absence of justification for use of force). There is no evidence of any physical injury having been caused by Bridges pointing his gun at Raby. Accordingly, since Bridges was attempting to arrest Raby by himself, and Raby had locked himself in the car, and because Bridges merely threatened force by pointing the gun at Raby, and because no physical injury was inflicted, the court concludes that there is insufficient evidence to establish that Bridges acted unreasonably by pointing a gun at Raby.

 Raby also contends that Bridges and Doty violated his Fourth Amendment rights because they assisted in the alleged battery of Raby at the Easter Seals Center by holding Raby while Mangum "pummeled" him. In his Deposition, Bridges states that he assisted in putting Raby on the floor of the Easter Seals Center. Bridges Deposition, page 68, lines 16–18. Doty also testified that he helped to restrain Raby on the ground and that Raby was restrained where there was broken glass that could have presented a danger to him. Doty Deposition, pages 14–15, 23. Raby also points out that Doty testified that while hitting Raby in the face was consistent with department policy, he did not think it was necessary. *Id.* at page 19, lines 11–15.

The Defendants argue that, while it is true that Bridges and Doty held Raby to subdue him, there is no evidence to indicate that they held Raby in order to allow Mangum to hit Raby. Instead, the Defendants argue, the efforts of both Bridges and Doty were needed to subdue Raby and were necessary. The court agrees that there is no evidence to indicate that Bridges and Doty held Raby in order to allow Mangum to hit him. In addition, there is no evidence to suggest that Bridges' and Doty's actions in holding Raby resulted in any injury, minor or otherwise. The court concludes that under the facts that Raby had fled from arrest, that he refused to comply with the officers' directions, and that he continued to fight once he was inside the Easter Seals Center, and that he apparently suffered no injury, holding him on the ground was not an unreasonable use of force. Bridge and Doty are, therefore, entitled to summary judgment on Raby's § 1983 claims.

3. Baptist Medical Center's Alleged Violation of Raby's Rights

Raby has not disputed the Defendants' contention that Baptist Medical Center cannot be held liable for Mangum's actions on the basis of respondeat superior or vicarious liability. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Eleventh Circuit has rejected the application of respondeat superior liability in cases where private entities are acting in the place of a governmental entity. *Buckner v. Toro,* 116 F.3d 450 (11th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 608, 139 L.Ed.2d 495 (1997). In addition, the Eighth Circuit has also concluded that a private corporation acting under state law will only be held liable for unconstitutional policies. *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972 (8th Cir.1993). This court has also previously applied the requirement of an official policy or custom in a claim of § 1983 liability brought against a private entity. *See McDuffie v. Hopper,* 982 F.Supp. 817, 826 n. 8 (M.D.Ala.1997). Under the policy or custom standard, a plaintiff must identify an official act, policy or custom of the employer and show a direct causal connection between the alleged deprivation and the act, policy or custom. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

 Raby argues that there is an official policy or custom which led to the deprivation of his constitutional rights. There are essen-

tially two methods of proving, in an excessive force suit, that a policy or custom caused the plaintiff's injury. *See Loggins v. Jeans,* 841 F.Supp. 1174 (N.D.Ga.1993). The plaintiff can show deliberate indifference to the rights of persons with whom the officers come in contact, or can show a persistent failure to take disciplinary actions against officers. *Id.* at 1176. The Defendants contend that the second of these categories cannot be established in this case since there is no evidence that Baptist Medical Center received any complaints about Mangum.

■ Raby argues that Mangum's record at Baptist Medical Center shows evidence of "sanitizing" because on the day that Raby was arrested, a complaint was lodged by Sarah Hutton and this complaint is not reflected in Mangum's record. The Defendants respond that there is a letter regarding the Sarah Hutton incident in Mangum's record. Regardless of whether Mangum's record does or does not contain this information, Sarah Hutton testified that she did not report the incident with Mangum until after the shooting had occurred. Sarah Hutton Deposition, page 11. Consequently, the court agrees that Raby has failed to present evidence which would create a question of fact as to whether Baptist Medical Center had failed to take disciplinary action against Mangum based on reported misconduct.

■ The Defendants also contend that there is no evidence of deliberate indifference to Raby's constitutional rights by hiring and retaining Mangum. The Defendants point to the Baptist Medical Center Police Department's policy and procedure manual which mandates that the use of a handgun to shoot at or from a moving vehicle is prohibited. Defendants' Exhibit 25. The Defendants also point out that the manual states that an officer may only use the force that is necessary to effect an arrest or otherwise accomplish an assigned task lawfully and that deadly force may only be used in defense of life or when there is imminent danger. *Id.* The Defendants argue, therefore, that there is no evidence that there was any policy of encouraging the excessive use of force and that, to the contrary, Baptist Medical Center police policy prohibited deadly force, except in limited circumstances.

The Defendants also point to Mangum's training and the fact that he was involved in a training program on the day in which he shot Raby and that he was certified by the Peace Officers Standards and Training Commission. In light of this evidence and the fact that Raby has not provided testimony to create a question of fact as to whether Mangum received adequate training, the court concludes that Raby has failed to establish failure to train as a viable theory for § 1983 liability in this case.

■ Raby has, however, provided testimony from Captain H.E. Cody of the Montgomery Police Department in which he states that he told Alford that he would not hire Mangum again. Cody Deposition page 9. In addition, Raby points to Alford's deposition testimony that he did not seek access to Mangum's police record with the Montgomery Police Department. Alford Deposition, at page 29. Alford also testified in his deposition that Mangum told him that he had been terminated by the Montgomery Police Department because of complaints had been made against him while he was with the department, although Mangum contended that the complaints were unsubstantiated. Alford Deposition, pages 14–15. Raby argues that Alford should have investigated Mangum's background based on this information and that, had he done so, he would have found out about concerns about Mangum's aggressiveness.

Raby has pointed this court to the Eleventh Circuit's decision in *Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989), *overruled on other grounds by, Turquitt v. Jefferson County, Ala.,* 137 F.3d 1285 (11th Cir.1998). Although *Parker* was overruled based on the relationship of sheriffs and counties under Alabama law, *Parker* was not overruled as to its application of general analytical principles to a § 1983 claim based on failure to investigate a hiree's background. This part of *Parker* explains that a county could be held liable based on a hiring decision either because the person making the hiring decision was acting pursuant to an official policy or custom, or because the decision maker was the repository of final authority with regard to personnel decisions. *Id.* at 1478. The Eleventh Circuit found that because the offi-

cial in question was the ultimate repository of county authority, his actions in hiring an employee without an adequate background check could be fairly ascribed to the county. *Id.* at 1479. This case establishes that a policy or custom can be established based on a personnel decision. *See also Mandel v. Doe,* 888 F.2d 783 (11th Cir.1989). It appears to be uncontested that Alford had final authority with regard to the decision to hire Mangum.[6]

While *Parker* stands for the proposition that the ultimate repository of authority can establish a policy or custom with a personnel decision,[7] the holding in *Parker* as to the standard for deliberate indifference has been called into question. *See Lancaster v. Monroe County, Alabama,* 116 F.3d 1419 (11th Cir.1997) ("The facts of *Parker* are similar to those in [*Board of County Commissioners v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ] and, for that reason, *Parker*'s holding on deliberate indifference may no longer be good law.").

In *Board of County Commissioners v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court described the standard which must be met in order to find deliberate indifference based on a failure to investigate an employee's background. The Court held that a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 1392. The court explained that only where adequate scrutiny of an applicant's background would lead a reasonable policy-

maker to conclude that the "plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference." *Id.* at 1391. In *Brown,* the court held that while evidence that the applicant had pleaded guilty to traffic offenses and other misdemeanors may have made him a poor candidate as a deputy, the municipality could not be held liable for deliberate indifference unless the plaintiff demonstrated that the decision to hire reflected a conscious disregard for a high risk that the officer would use excessive force in violation of the plaintiff's federally protected right. *Id.* at 1393.

In this case, as outlined above, there is evidence that Alford knew or should have known about Mangum's prior history: Alford was told by Mangum's former employer that he would not hire Mangum again and Alford was told by Mangum that he had been terminated by the Montgomery Police Department and that complaints had been made against him. Furthermore, Alford had access to, but never sought Mangum's records. To meet the *Brown* standard, however, Raby must also show that the hiring decision and Raby's injury have the requisite causal link.

■■■ To meet this burden, Raby has provided the personnel files of Mangum from his service with the Montgomery Police Department.[8] Within this file is a Memo from Cody to another Montgomery Police Department Officer about a complaint of Mangum's alleged excessive use of force.[9] Cody reveals

---

**6.** The Defendants state in brief that the authority to appoint and employ persons as police officers has been delegated to Alford. The Defendants appear at this juncture to concede that Alford is the final repository of authority on personnel decisions. *See Morro v. City of Birmingham,* 117 F.3d 508 (11th Cir.1997) (city waived the issue of whether the police chief's decisions were subject to meaningful administrative review).

**7.** In *Brown,* the court assumed without deciding that a single instance of screening could trigger municipal liability. *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626 (1997).

**8.** The Defendants have characterized the personnel file as unauthenticated and as containing hearsay; however, the Defendants have not chal-

lenged the authenticity of the personnel file. Raby's attorney has represented in brief that evidence he has cited was contained in the personnel file provided to Raby by the City of Montgomery and has provided a letter of transmittal of the personnel file from the City Attorney. Plaintiff's Exhibit 29. The court will therefore consider those portions of the authenticated personnel file which are otherwise admissible.

**9.** This memo is an exhibit to Cody's deposition and questions were asked of Cody about this memo during his deposition, although the entire portion of the deposition discussing the memo has not been provided to the court. In the portion provided to the court, it appears that Cody agreed with the statement that he had recommended that Mangum be taken off duty and evaluated, although he could not remember

in the Memo that he counseled Mangum about an overreaction that Mangum had and told Mangum that he would have to adjust to using less aggressive action and speech. Exhibit 26. Cody refers to concerns about Mangum's "overly aggressive behavior" towards the public. *Id.* Cody makes a recommendation of "strong disciplinary action for his unacceptable behavior toward civilians, peers, and superiors." *Id.* Raby has also pointed to the minutes of the meeting which was held when Mangum was terminated. In this document, Mangum admits that he was called into a conference in which complaints about his excessive use of force were discussed. Exhibit 27, page 2. Mangum also makes the admission that he had suspects who had resisted arrest and that one of the suspects who resisted arrest had to go to the hospital. *Id.* at page 7.

Although the standard imposed by *Brown* requires evidence of a causal connection that apparently is more difficult to meet than was previously required by the Eleventh Circuit under *Parker,* the court concludes that Raby has produced sufficient evidence to meet his burden for summary judgment purposes. The evidence indicates that Alford failed to investigate Raby's background even though he was told the police department would not again hire Mangum and even though he knew that Mangum had been terminated and that complaints, whether substantiated or not, had been made against him, and even though he had access to Raby's personnel files. Beyond showing that Alford failed to fully look into Mangum's background, however, Raby has also pointed to evidence that Mangum had been confronted about his allegedly aggressive behavior and that a person Mangum had arrested in the past needed hospitalization. Evidence of aggressiveness, especially in the context of a suspect who required hospitalization, is tied to the constitutional right at issue here. *See Brown,* 520 U.S. 397, 117 S.Ct. 1382 ("whether Sheriff

Moore failed to examine Burns' record, partially examined it, or fully examined it, Sheriff Moore's hiring decision could not have been 'deliberately indifferent' unless in light of that record Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision."). The court concludes that the evidence provided by Raby meets the causal connection requirement to impose liability upon Baptist Medical Center based on deliberate indifference under *Burns.*

4. DeBoer's and Alford's Alleged Violation of Raby's Rights

 As to the supervisory liability of DeBoer and Alford, the Defendants have argued that neither one of these defendants' actions caused the alleged constitutional deprivation at issue in this case. As stated by the Eleventh Circuit in *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1192 (11th Cir.1994),

> To recover individually from [state officials] who were in supervisory or policy-making capacities, the [Plaintiff] must show that [the supervisors] are liable either through their "personal participation" in the acts comprising the alleged constitutional violation or "the existence of a causal connection" linking their actions with the violation.

Policymaking and supervisory officials may be held liable in their individual capacity not only for personal participation, but based on supervision. In order to find the supervisor liable under this theory, more than merely respondeat superior liability must be shown. *Braddy v. Florida Dept. of Labor & Emp. Sec.,* 133 F.3d 797, 801 (11th Cir.1998). Indeed, the Eleventh Circuit just recently characterized the "standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate [as an] *extremely rigorous* " standard for a plaintiff to

<hr>

if this statement was in his own memo or in another memo. Although not specifically challenged as hearsay, the court notes that this memo contains hearsay. Hearsay evidence may be considered by the court on summary judgment if it may be reduced to admissible form at trial. *Church of Scientology Flag Service Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1530 (11th Cir.1993), *cert. denied,* 513 U.S. 807, 115 S.Ct.

54, 130 L.Ed.2d 13 (1994) To the extent that Cody did not testify in his deposition as to information which is also in the Memo, Cody could testify at trial to those facts which are within Cody's personal knowledge. In addition, the court has only considered those portions of the Memo which are statements by Cody himself which appear to be based on his personal knowledge.

satisfy. *Id.* at 802 (emphasis added). A supervisor can be held liable under § 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff and his conduct was casually related to the constitutional violation which his subordinate committed. *McKinney v. DeKalb County, Ga.,* 997 F.2d 1440 (11th Cir.1993).

▄▄ The court agrees that there is no evidence that DeBoer was put on notice of a need to correct an alleged deprivation, or that DeBoer established a policy that directly led to the constitutional violation. *Braddy v. Florida Dept. of Labor & Emp. Sec.,* 133 F.3d 797 (11th Cir.1998). DeBoer is, therefore, entitled to summary judgment in his individual capacity on Raby's claims.

▄▄ Raby has argued, however, that Alford can be held liable based on his deliberate indifference in the decision to hire Mangum. The Fifth Circuit has reasoned that the standard of deliberate indifference which is required to hold liable a municipality also is required to hold a school official liable for a violation of substantive due process rights under § 1983. *Doe v. Taylor Independent School District,* 15 F.3d 443 (5th Cir.1994) (en banc). The Fifth Circuit has also concluded that a failure to supervise or train can be deliberate indifference leading to supervisory liability in an excessive force case. *See Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir. 1986). Accordingly, the court concludes that the evidence presented as to Alford's deliberate indifference for purposes of holding Baptist Medical Center responsible for Mangum's actions is also evidence which supports a claim against Alford individually.

### B. Application of Qualified Immunity Doctrine

▄▄ The Defendants argue that even if any of the individual defendants did violate Raby's Fourth Amendment rights, they are entitled to qualified immunity. Qualified immunity is designed to allow government officials to avoid the expense and disruption of going to trial, and is not merely a defense to liability. *Ansley v. Heinrich,* 925 F.2d 1339, 1345 (11th Cir.1991). The Supreme Court has referred to the qualified immunity analysis as the "objective-reasonableness" test. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19,

102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). An official is entitled to qualified immunity if he is performing discretionary functions and his actions do " 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1424 (11th Cir.1997).

▄▄ To overcome this immunity, a plaintiff has the burden of "pointing to case law which predates the official's alleged improper conduct, involves materially similar facts, and truly compels the conclusion that the plaintiff had a right under federal law." *Santamorena v. Georgia Military College,* 147 F.3d 1337 (11th Cir.1998). When considering whether the law applicable to certain facts is clearly established, the facts of the case need not be the same, but must be materially similar. *Id.* at 1339. Only in exceptional cases are the words of a federal statute or constitutional provision specific enough, or the general constitutional rule already identified in decisional law so clearly applicable, so that specific case law is not required. *See id.* at 1339 n. 6.

▄▄ It is apparently undisputed that all of the Defendants were acting within their discretionary authority when the events giving rise to this case transpired. Before determining whether the individual defendants violated clearly established law, however, the court must address the threshold question of whether the Baptist Medical Center police officers are entitled to claim the benefits of qualified immunity from liability under § 1983. Not all defendants who may be sued under § 1983 are entitled to claim qualified immunity. *See Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992); *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997); *McDuffie v. Hopper,* 982 F.Supp. 817 (M.D.Ala.1997).

If the police officers against whom claims have been brought in this case were employed by a subdivision of the state or a municipality, there would be no question but that they would be entitled to invoke the protection of qualified immunity. In this case, however, the police officers, who are vested with the same powers as municipal

police officers by act of the Legislature, are employed by a private entity.

The Supreme Court has addressed the availability of the qualified immunity defense to private defendants in two somewhat limited circumstances. In *Wyatt v. Cole*, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), the Court held that private defendants who were sued because they relied on state replevin, garnishment, or attachment procedures are not entitled to invoke a qualified immunity defense. This prompted some courts to conclude that private persons cannot invoke qualified immunity. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3rd Cir.1994). In 1997, however, the Supreme Court explained that *Wyatt* did not answer the question of whether employees of a private prison management firm were entitled to claim qualified immunity. *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997).

In *Richardson*, the court held that prison guards employed by a private contractor with the government were not entitled to qualified immunity. *Id.* at 2108. The Supreme Court stated, however, that the holding of *Richardson* is limited to contexts in which a "private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Id.* The limitations placed by the Supreme Court in its decisions in *Wyatt* and *Richardson* reveal that those cases do not answer the question presented by the facts of this case since this case does not involve garnishment, replevin, or attachment, nor a contract with the government for performance of a lengthy, administrative task.

■ Although the Supreme Court has not established a bright-line test for determining when a private defendant is entitled to invoke the protection of the doctrine of qualified immunity, the Supreme Court has explained the framework that a court must look to in deciding whether qualified immunity may be invoked by a private entity. *Richardson*, 117 S.Ct. at 2104. A court is to look both to history and the purposes that underlie government employee immunity. *Id.*

In *Richardson*, the Supreme Court held that private defendants were not entitled to invoke qualified immunity because historically, prisons had been run by private entities without the protection of immunity, and because private companies and their employees have other incentives to zealously perform their duties which civil service employees do not have. *Id.* at ——, 117 S.Ct. at 2106; *see also McDuffie*, 982 F.Supp. at 823.

In this case, the parties have not pointed this court to any historical precedent for applying immunities at all. Upon independent research, however, the court has found that immunities were consistently applied to police officers employed by the state in actions such as false imprisonment. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court explained that police officers have never had absolute immunity, but that the prevailing view in the country is that a peace officer who arrests someone with probable cause is not liable for false arrest simply because the suspect is later proven to be not guilty. The Court noted that a policeman, under the majority view, did not have to choose between a dereliction of duty if he does not arrest when he has probable cause, and being liable for damages when he does. *Id.* at 555, 87 S.Ct. 1213; *see also* Laura Oren, *Immunity and Accountability in Civil Rights Litigation: Who Should Pay?*, 50 U.Pitt.L.Rev. 935 (Summer 1989) (discussing trend toward making neither police officers nor victims bear the cost of a mistake, but placing responsibility with the government). This historical information indicates that policemen have traditionally been protected by at least some form of immunity. Of course, in *Richardson*, the Court focused on the lack of immunities for privately-run prisons, while the historical information about immunities for police officers does not speak to the existence of immunities for private persons employed as police officers. Whether or not the historical existence of immunities for police officers fits the first *Richardson* prong, however, it does point to the significance of the purpose of immunities within the context of law enforcement.

As to the purposes of qualified immunity prong, the Court in *Richardson* determined that there were other factors which compelled performance in Richardson, so that there was no special need for immunity. The Court reasoned that private employees are different from government employees because a private firm can respond to market pressures through rewards and penalties that operate directly on employees. *Richardson*, 521 U.S. at ——, 117 S.Ct. at 2107. The Court explained that qualified immunity does not apply because the job was one that private industry might or might not perform and because the organizational structure is one which is subject to the ordinary competitive pressures that help private firms adjust their behavior in response to the incentives that tort suits bring. *Id.* at ——, 117 S.Ct. at 2108.

The concerns focused on in *Richardson* do not appear, however, to be particularly relevant in the instant case. In *Richardson,* the private entity faced competitive pressures from other firms which would cause it to make sure that its guards were acting appropriately. *Richardson,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540. In other words, the employees who allegedly violated rights were performing tasks pursuant to the entity's fulfillment of an administrative task as a contractor with the state. In this case, however, Baptist Medical Center does not contract with the state to perform a lengthy administrative task. Baptist Medical Center is not competing with another firm for government contracts. Furthermore, Baptist Medical Center is a not-for-profit corporation which provides medical services, but the individual defendants employed by Baptist Medical Center were not providing medical services, but were instead employed as a security measure. In other words, Baptist Medical Center does not have the same competitive pressures that were identified in Richardson because (1) it is not competing for government contracts and (2) the individual defendants were performing tasks incidental to the entity's main purpose of providing medical care, so that, presumably, Baptist Medical Center had less of an interest in the way in which the individuals were performing their jobs. Therefore, the different factual posture of the instant case

from *Richardson* leads this court to conclude that the need for immunity is not undermined by reliance on competitive pressures.

Not only do the policy concerns identified and relied on in *Richardson* not undermine the need for immunity in this case, but there is also strong precedent supporting policy reasons for applying immunity in similar situations. The Supreme Court has recognized that immunity is important for government officials where it is necessary to preserve their ability to serve the public good, or to ensure that talented candidates were not deterred by the threat of damage suits from entering public service. *Wyatt,* 112 S.Ct. at 1833. The Court has specifically emphasized the importance of immunities for police officers, stating that private parties, unlike police officers, hold no office requiring them to exercise discretion, nor are they principally concerned with enhancing the public good. *Id.* In addition, binding precedent analogizes a prosecutor participating in a search and seizure to a police officer and holds that such a prosecutor is entitled to qualified immunity because he should be entitled to the same immunity which the Supreme Court has determined is necessary and sufficient to preserve the ability of police officers to function effectively. *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980). The need for immunity is apparent when one considers the nature of the job performed by police officers. By the very nature of the duties which they are called on to perform, police officers subject themselves to tort liability. Performing their role of protecting the public necessarily means that they commit torts such as trespass and assault. Without qualified immunity, police officers would similarly be subject to liability under § 1983 for these same actions. In other words, not only is there a history of immunities applied to police officers, but there is also strong precedent pointing to the special need for immunities for police officers.

In addition, *Richardson* did not foreclose the possibility that qualified immunity be applied to some private defendants, stating "[t]he case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in

an essential government activity, or acting under close official supervision." *Richardson*, 521 U.S. at ——, 117 S.Ct. at 2108.

Although the court has not found binding precedent interpreting the *Richardson* Court's use of the term "serving as an adjunct to government in an essential government activity," in distinguishing *Richardson*, the Second Circuit noted that in investigating and reporting instances of public fraud, fiscal intermediaries and carriers are acting as adjuncts to the government and are carrying out a traditional government function. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2nd Cir.1998); *see also* Brett R. Carter, *Richardson v. McKnight: the Rise and Fall of Private Prison Guards' Qualified Immunity*, 28 U.Mem.L.Rev. 611, 635 (Winter 1998) ("*Richardson* seems to suggest, despite affirming the *Wyatt* test, that policy may overcome the lack of common law support for immunity in cases where private parties are in close associations with the government.")

The unique factual circumstances of this case appear to bring Baptist Medical Center police officers within this rationale. The Alabama Legislature has specifically passed an Act giving Baptist Medical Center the right to hire persons whom the Act then states have "all the powers of state or municipal police officers." Acts of Alabama 1996, No. 96–518. These powers specifically include the right to arrest any person pursuant to a warrant when that person is on the premises of Baptist and is charged with any public offense. *Id.* The Act also gives these officers the power to act outside of Baptist premises if there is a non-vehicular pursuit and to make arrests for crimes which have been committed, or for which there is reasonable cause to believe have been committed, within the boundaries of property owned or operated by Baptist. *Id.* In short, some of the specifically enumerated powers go beyond merely protecting Baptist Medical Center from crimes committed there, to protecting the public at large. *See* Act of Alabama 1996, No. 96–518.

In summary, because the policy concerns which have prompted courts to apply qualified immunity to municipal police officers also apply to Baptist Medical Center police officers, the court finds that the unique factual circumstances presented by this case require the application of qualified immunity to these private defendants to whom the state has given the same powers as those given to state and municipal police officers.

### 1. Qualified Immunity of Mangum

■ Even though Baptist Medical Center police officers are entitled to claim the protection of the doctrine of qualified immunity, this does not necessarily mean that they are entitled to qualified immunity in this case. In fact, the court cannot conclude that Mangum would be entitled to such protection for his conduct in shooting Raby. The court has, as previously discussed, concluded that the facts presented allow for the conclusion to be drawn that Mangum engaged in an unreasonable use of deadly force.

The Eleventh Circuit has specifically held that "shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was ... an unreasonable search and seizure and clearly violated fourth amendment law." *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir.1987). When Raby's evidence is accepted as true, the facts in this case are that Mangum and Bridges attempted to arrest Raby for trespassing, that Raby was sitting in his parked car, that he turned the ignition of the car on, but had not put the car in gear, that Mangum ran to the front driver's side of the car and shot Raby before the car was in motion. Under Raby's testimony, he was neither fleeing nor threatening the officers or others at the time that he was shot. Further, he was not committing a felony. It is clearly established that Mangum could not use deadly force in order to prevent a misdemeanant from fleeing, if the officer's life was not in danger. Therefore, Mangum's actions violated clearly established Eleventh Circuit precedent.

The court recognizes that qualified immunity analysis in the Eleventh Circuit is fact-driven and that officials are generally found to not be entitled to the protections of qualified immunity only when there is a factually-specific, analogous case. *See Santamorena*, 147 F.3d 1337, 1339. However, the use of deadly force in a circumstance where such force is unreasonable is a fact situation that

has been identified in the decisional law and which applies "with obvious clarity to the specific conduct in question." *Id.* at 1339 n. 6. The Eleventh Circuit has held, in the context of a police shooting where the suspect was shifting position, but not threatening any officer at the time in which force was applied, that "the law was clearly established before ... March 1990 that police use of excessive force is a constitutional violation." *McKinney v. DeKalb County, Georgia,* 997 F.2d 1440, 1443 (11th Cir.1993); *see also Sheth v. Webster,* 145 F.3d 1231, 1238 (11th Cir.1998) (officer not entitled to qualified immunity where there was "no evidence in the record to suggest that plaintiff posed a danger to the officer or others.") In fact, the Eleventh Circuit has even recognized, without resolving, that there is a debate about whether police officers can receive immunity for the excessive use of force. *Popham v. City of Kennesaw,* 820 F.2d 1570 (11th Cir. 1987). Accordingly, this court finds that, given the disputed issues of fact as to the timing of the shooting in this case, Mangum's shooting of Raby violated clearly established law.

■ As was previously discussed, although Raby has argued that Mangum used unreasonable force in the Easter Seals Center, this court has concluded that Raby has failed to create a question of fact as to whether this use of force was unreasonable. However, even if Mangum had violated Raby's rights by his actions in the Easter Seals Center, the court concludes that Mangum would be entitled to qualified immunity on this claim.

■ To show that a police officer violated a clearly established right to be free from unreasonable seizures, the application of force must inevitably lead an official in the officer's position to conclude that the force was unlawful. *Jones v. City of Dothan, Alabama,* 121 F.3d 1456 (11th Cir.1997).

As was previously discussed, Raby has not argued, nor presented any evidence, that he suffered any injuries as a result of his apprehension in the Easter Seals Center. Instead, he has argued that Mangum's actions in subduing him on broken glass **could have** resulted in injuries. Raby has also cited Doty's testimony that he thought striking Raby was

unnecessary. Under Eleventh Circuit precedent, even where the force used is unnecessary, if the force and the resulting injuries are minor in nature, a reasonable officer would not inevitably conclude that the force used was unlawful. *Jones,* 121 F.3d at 1460. This court has previously concluded that use of a nightstick, where a suspect had resisted arrest and where there was no evidence that the nightstick caused any physical injury, was not a use of force that would lead every reasonable officer to conclude that the force used was unreasonable. *See Griffin v. City of Clanton, Alabama,* 932 F.Supp. 1359 (M.D.Ala.1996). Accordingly, the court concludes that, to the extent that Raby's rights might have been violated when he was apprehended, Mangum is entitled to qualified immunity based on his actions in apprehending Raby at the Easter Seals Center.

2. Qualified Immunity of Bridges and Doty

■ The court has previously concluded that Bridges did not violate Raby's Fourth Amendment rights by pointing a gun at him through the car window. Even if Bridges violated Raby's Fourth Amendment rights by pointing a gun at him, because there was a complete lack of evidence of a physical injury, the force used would not inevitably lead a reasonable officer to conclude the force was unlawful. *Gold v. City of Miami,* 121 F.3d 1442 (11th Cir.1997) (minor nature of injury indicated that minimal force was used so that circumstances would not inevitably lead an officer to conclude the force was unlawful so that qualified immunity applied).

Similarly, the force applied by Doty and Bridges in the Easter Seals Center was apparently not great enough to cause Raby any injuries, or at least no evidence has been provided to this court of any resulting injuries. Accordingly, the court concludes that, to the extent that Doty and Bridges may have violated Raby's constitutional rights, Doty and Bridges are entitled to qualified immunity.

3. Qualified Immunity of Alford and DeBoer

The court first notes that it has found no violation of Raby's constitutional rights which are attributable to DeBoer under any of the relevant standards of liability under § 1983.

Accordingly, there is no claim for relief against which DeBoer must invoke the doctrine of qualified immunity.

■ As to the qualified immunity for Alford, based on his hiring of Mangum, it is apparently undisputed that Alford was engaged in a discretionary action. In determining whether Alford's actions violated clearly established law, the court must bear in mind that while violations of constitutional rights are evaluated based on the constitutional standards at the time of litigation, qualified immunity is evaluated based on the state of the law at the time of the alleged offense. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *cf. Rankin v. Klevenhagen,* 5 F.3d 103, 108 (5th Cir.1993) (summarizing Fifth Circuit cases applying different excessive force standards depending on when the offense occurred). Consequently, the law in the Eleventh Circuit as it existed at the time of Alford's hiring was the *Parker* decision

■ In *Parker,* the Eleventh Circuit held that a reasonable official could not have concluded that hiring and promoting a person who had been convicted of indecent exposure, had undergone treatment for mental problems, and had a history of drug abuse did not violate third parties' Fourteenth Amendment rights to be free from serious personal injury during pretrial detainment. *Parker,* 862 F.2d at 1477. This case did not involve a situation where a supervisor failed to explore a former employer's statement that he would not again hire a former employee or the employee's admission that complaints had been made against him. Therefore, the case did not provide the " 'bright line' necessary to delineate the concrete circumstances in which officials will violate the Constitution." *Santamorena,* 147 F.3d 1337, 1340. Furthermore, deliberate indifference determinations, unlike questions of excessive use of force, have not been so clearly defined so as to be obviously applicable without case law with substantially similar facts. Because the facts are not substantially similar, the court concludes that a reasonable official in Alford's position would not have known that his failure to further investigate Mangum's background violated Constitutional rights. Consequently, the court concludes that qualified immunity is due to be granted to Alford.

While it may seem somewhat counter-intuitive for the deliberate indifference standard to be satisfied for purposes of holding Baptist Medical Center liable on the basis of Alford's actions, but not to be clearly established in order to defeat Alford's qualified immunity, such a conclusion stems from the purposes of qualified immunity. That is, the question of whether or not an official is entitled to claim immunity from suit in his or her individual capacity based on policy concerns is a separate question from the question of whether his or her acts violated a constitutional right. *Santamorena,* 147 F.3d 1337, 1339. Accordingly, Alford is entitled to qualified immunity on Raby's claims.

### V. *CONCLUSION*

For reasons discussed, the Defendants' Motion for Summary Judgment is due to be GRANTED in part and DENIED in part as to Raby's § 1983 claims. A separate Order will be entered in accordance with this Memorandum Opinion as to Raby's § 1983 claims, and an additional Order will be entered with respect to Raby's state law claims.