UNITED STATES of America, Plaintiff-Appellee,

v.

Otto HOFFMAN and Richard Curotto, Defendants-Appellants.

No. 73-2030.

United States Court of Appeals, Seventh Circuit.

Heard April 5, 1974.

Decided June 25, 1974.

---

16. See People v. Jiles, *supra* n. 7.

17. See the Court's footnote 5 in *Kent,* 383 U.S. at 546; and 383 U.S. at 555–556.

Charles R. Purcell, Lawrence E. Morrissey, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Jeremy D. Margolis, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, CUMMINGS and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendant railroad police officers were named in a 13-count indictment. The first count charged that they and Chester Garelli, an unindicted co-conspirator, conspired to deprive seven named individuals of their constitutional rights in violation of 18 U.S.C. § 241. The twelve substantive counts charged violations of twelve individuals' constitu-

tional rights in violation of 18 U.S.C. §§ 242 and 2 over a time period ranging from early October 1971 to April 1972. A jury found the defendants guilty on all counts. They received concurrent sentences of two years on the conspiracy count and one year on each of the remaining counts.

A 1968 Illinois statute gave the defendants and Garelli, as members of the Penn Central Transportation Company's police force, "like police powers as those conferred upon the police of cities." Ill.Rev.Stat.1973, ch. 114, § 98.[1] In addition, Curotto was commissioned as a special police officer by the Chicago Police Department in 1966 and Hoffman in 1960. Those commissions were "renew[ed]" or "update[d]" in 1973.

■ Defendants do not challenge the sufficiency of the evidence to show that they committed a number of assaults and batteries upon persons found on or near the property of Penn Central. Instead, they claim the evidence was insufficient to support a finding that they were acting under color of Illinois law with specific intent to deprive persons of rights secured by the Constitution of the United States. The evidence describes beating and other mistreatment of vagrants found on railroad property or adjacent thereto. As defendants' brief states, "All of these are undeniable examples of brutal assaults * * *."

The record shows that the defendants acted under color of state law. The acts charged occurred while they and Garelli were on duty and were armed with service revolvers while possessing the same powers as city police. One of their functions was to eject trespassers. They were required to submit daily time and activities sheets showing, *inter alia*, the number of trespassers ejected. They used the railroad police communication system to report their activities. Curotto attempted to justify his conduct to a fellow officer, stating that the trespassers were constant repeaters and that

he had to use brutal tactics to keep them from returning. In sum, the acts alleged in the indictment occurred under the authority granted them as railroad policemen rather than as private persons. Under the applicable precedents, it is plain that the assaults occurred while they were cloaked with the authority of the state, thus constituting action under color of law within 18 U.S.C. §§ 241 and 242. Williams v. United States, 341 U. S. 97, 71 S.Ct. 576, 95 L.Ed. 774; cf. Griffin v. Maryland, 378 U.S. 130, 84 S. Ct. 1770, 12 L.Ed.2d 754.

Defendants rely on Ouzts v. Maryland National Insurance Co., 470 F.2d 790 (9th Cir. 1972); Bichel Optical Laboratories v. Marquette National Bank, 487 F.2d 906 (8th Cir. 1973); and Adams v. Southern California First Nat'l Bank, 492 F.2d 324 (9th Cir. 1973). We need not decide whether we agree with those cases, for all are distinguishable. None of them involves a continuing delegation of the law enforcement power of the state. *Ouzts* involved a statute authorizing a bail bondsman to arrest a fugitive whose court appearance he had insured. *Bichel* and *Adams* involved secured creditor self-help repossession statutes. Common to each of these cases is a preexisting contractual relationship, and a narrow delegation to a private party of powers normally reserved to the state to enforce particular rights in each instance in which breach of contract is threatened. Defendants here, by contrast, are authorized on a continuing and full-time basis to search actively for criminals and trespassers and to use the powers of the state when their search is successful. Their territorial jurisdiction is limited, but unlike the defendants in *Ouzts, Bichel* and *Adams*, they are not limited to taking action only against certain previously identified persons for one narrowly defined offense.

■ We reject defendants' argument that they merely served the private interests of the railroad, and that what

---

I. In United States v. Belcher, 448 F.2d 494, 497 (7th Cir. 1971), we determined that rail-

road policemen have "authority as police officers under the Illinois Statutes."

made their brutality possible was not their police power, but their private employment which gave them access to railroad property. Illinois has concluded that crimes against the railroad and its passengers and employees are a matter of public concern. Trespass on posted land is a misdemeanor. Ill.Rev.Stat. 1973, ch. 38, § 21–3. The statute delegating police power to defendants states that they are to "aid and supplement" municipal police forces. Ill.Rev.Stat. 1973, ch. 114, § 98. "If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity * * *." Griffin v. Maryland, 378 U.S. at 135.

■ Defendants' argument that they could not have acted under color of law unless they initiated the formal processes of the criminal law is frivolous. The essence of their federal offense is precisely that they attempted to enforce the law by coercive means while bypassing the procedures designed to protect the rights of the trespassers.

■ Defendants assert that the evidence is insufficient for the jury to conclude that they intended to deprive their victims of rights secured by the federal Constitution. But defendants inflicted summary punishment under color of law, thus willfully intending to deprive their victims of due process of law. Crews v. United States, 160 F.2d 746, 749–750 (5th Cir. 1947); United States v. Delerme, 457 F.2d 156, 161 (3d Cir. 1972). As those cases hold, it is immaterial that defendants may have received personal gratification from the brutality.

■ Defendants also assail one of the intent instructions given by the district court. They acknowledge the correctness of the following instruction contained in the court's charge:

"[T]here must have been an intent on the part of the defendant willfully to subject the victim to a deprivation of a right, privilege or immunity secured

or protected by the Constitution and the laws of the United States."

They complain that the force of this instruction "is immediately watered down" by the next instruction, which provided:

"Now, 'specific intent' is required and the term means more than a general intent to commit the act. To establish specific intent the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law, but such intent may be determined from all of the facts and circumstances surrounding the case."

This latter instruction is said to permit the jury to convict without finding that the defendants' acts were specifically intended to deprive their victims of a constitutional right. However, when the two instructions are taken together, it is clear that the "act which the law forbids" in the second instruction refers to a deprivation of a constitutional right, as mentioned in the first instruction. This interpretation is reinforced by another instruction on intent reading as follows:

" 'Intent' is merely the presence of a willingness to commit the act charged. It does not require knowledge that such an act is in violation of the law but it is necessary that the defendants had the actual knowledge —but it is necessary that the defendants have had the actual purpose of depriving the victims of their constitutional rights enumerated in the indictment."

Since the overall effect of the charge on intent stated the law with substantial accuracy, nothing more was required. Clark v. United States, 193 F.2d 294 (5th Cir. 1951).

■ Finally, defendants request a new trial on the ground that the trial judge erroneously admitted evidence that Hoffman and Curotto had been appointed special policemen by the Superintendent of Police of Chicago in 1960 and 1966 respectively and that those appointments were renewed in 1973. As

defendants observe, no evidence was adduced to show that the commissions in question were renewed annually under ch. 173–7 [2] of the Municipal Code of Chicago through the period of time charged in the indictment. Another provision of the Municipal Code exempts special policemen of a common carrier from the licensing provisions.[3] It thus appears that defendants' commissions expired after one year, but that they were not required to renew their commissions annually because they were not required to be commissioned at all. It follows that these commissions were not admissible to show that defendants were granted law enforcement authority by the City of Chicago. But if there were any error here, it was harmless beyond a reasonable doubt, for defendants have not denied that they had law enforcement authority; their contention has been that they were not acting pursuant to that authority when they beat their victims. Furthermore, defense counsel objected to the admission of these documents only on the erroneous ground that the indictment did not "say anything about the City of Chicago."

■ Finally, the records were introduced expressly to prove that defendants were "commissioned special police officers for the Penn Central Transportation Company." The exhibits showed that Hoffman had been a Penn Central policeman for 12½ years prior to February 2, 1973, and that Curotto had been such for 7 years prior to July 12, 1973. The Government had to prove that de-fendants were railroad policemen to show that the Illinois statute granting the powers of city police was applicable. The exhibits were admissible for this purpose, and no limiting instruction was requested.

Judgments affirmed.

2. Ch. 173–7 provides:
   "The superintendent of police shall issue a special certificate of appointment to each person appointed as a special policeman, which certificate shall expire one year from the date of its issuance. The superintendent of police shall have power to renew any such appointment for a period of one year. He shall keep a correct list of all persons appointed as special policemen."

3. Ch. 173–2 of the Municipal Code provides:
   "It shall be unlawful for any person to engage in the business of a special policeman without first being appointed and licensed therefor; provided, however, that

no license shall be required of a special policeman engaged in the business of protecting persons, passengers, and property being transported in interstate or intrastate commerce within the city by a common carrier and the protection of the property of said common carrier within the city, but a special policeman engaged in such business shall comply with all the other provisions of this chapter applicable to him."

Furthermore, ch. 173–12 permits the Superintendent of Police of Chicago to revoke a certificate of appointment for a special policeman of a common carrier only "for cause."