William PAYTON, Plaintiff,

v.

RUSH–PRESBYTERIAN–ST. LUKE'S MEDICAL CENTER, an Illinois corporation, Rick Freeman, individually and as agent and servant of Rush–Presbyterian–St. Luke's Medical Center, Anthony Murray, individually and as agent and servant of Rush–Presbyterian–St. Luke's Medical Center, and James Blair, individually and as agent and servant of Rush–Presbyterian–St. Luke's Medical Center, Defendants.

No. 97 C 5558.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 27, 2000.

Claudia E. Sainsot, Chicago, IL, Cathy Ann Pilkington, Law Office of Cathy Ann Pilkington, Chicago, IL, for William Payton.

Phillip Hallett Snelling, Chicago, IL, for Rush-Presbyterian St. Luke's Medical Center, Rick Freeman, Anthony Murray, William Blair.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

The district court[1] dismissed William Payton's 42 U.S.C. § 1983 claims on the defendants'[2] 12(b)(6) motion because, the court held, Payton failed to meet a heightened pleading standard. The Seventh Circuit reversed, stating that no heightened pleading requirement exists. *Payton v. Rush–Presbyterian–St. Luke's Med. Center,* 184 F.3d 623, 627 (7th Cir.1999). The defendants have filed a motion for summary judgment, which we grant in part and deny in part. In analyzing the defendants' motion, we will assume the reader of this opinion is familiar with the facts of this case which are adequately set forth in detail in the Seventh Circuit's opinion. We will only briefly summarize the facts which are relevant to this opinion.

This lawsuit concerns an unfortunate incident that occurred on March 14, 1995 at Rush–Presbyterian–St. Luke's Medical Center. On the day of the incident, shortly before Payton's arrival at Rush, Marla Calvin and her supervisor James Blair told Rick Freeman, a Rush security guard, that they were concerned about Payton's impending arrival at the hospital. In addition, Freeman was told that Calvin had earlier made out a police report because she felt that Payton had been following her and that he had let the air out of her tires. (R. 45, App. Supporting Pl.'s Statement of Facts, Freeman Dep. at 70.) Blair explicitly told Freeman that he did not want Payton to come into the financial department, where Calvin and Blair worked, (R. 44–2, Pl.'s Additional Facts ¶ 52 & 53), because he did not want any upheaval, (R.

44–1, Pl.'s Response to Defs.' Statement of Facts ¶ 34b.) Freeman called Anthony Murray, another Rush guard, for assistance. When Payton entered the hospital and proceeded toward the financial department, Freeman told him to stop and that he couldn't go into that area. Payton, who had almost reached the door to the financial department, turned around, walked back toward the two officers, stated "Ok, I'll leave now" and headed toward the exit door. (R. 44–2, Pl.'s Additional Facts ¶ 82.) Freeman and Murray followed Payton. The guards told Payton again to stop and tried to ask him some questions, but Payton refused to stop. The three men had a physical struggle and the guards then arrested Payton.

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff cannot rest on mere allegations, but must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. *Crim v. Board of Educ. of Cairo Sch. Dist. No. 1,* 147 F.3d 535, 540 (7th Cir.1998).

1. This case was originally assigned to Judge Ann Williams who recently received confirmation of her appointment to the Seventh Circuit. The case was reassigned to this Court on December 15, 1999.

2. Unless we specify otherwise, "defendants" will refer to all four of the above-captioned defendants.

However, if the evidence is merely colorable, is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505.

## II. State Action

We begin our analysis with the Seventh Circuit's conclusions regarding state action in this case. The majority on appeal concluded that "for purposes of determining whether [the hospital guards] could be state actors in this case, no legal difference exists between a privately employed special officer with full police powers and a regular Chicago police officer." *Payton*, 184 F.3d at 630. That statement, made in the context of the appellate court's review of the district court's ruling on a motion to dismiss does not, however, require a finding of state action at this point in the litigation, when we are considering a motion for summary judgment. As Judge Ripple pointed out in his concurrence, "Further development of the record might well establish ... that the guards' responsibilities were significantly circumscribed by their employer and that they performed well-defined functions quite narrow in scope—duties that cannot be considered an integral aspect of the exercise of a function that has been traditionally the exclusive prerogative of the state." *Id.* at 634 (Ripple, J., concurring). Thus, if Rush sufficiently circumscribed the security guards' police powers, these defendants may not be state actors.

█ The defendants, however, have not presented evidence that Rush circumscribed the guards' powers. Instead, the defendants point to the guards' specific actions being challenged in this lawsuit: "The record shows that Freeman and Murray were not exercising the full range of police power delegated to them under the Ordinance, but that they merely stopped and held Payton pending arrival by the Chicago Police who formally arrested him." (R. 35, Defs.' Mot. for Summ. J. at 4.) The argument shows a misunderstanding of the Seventh Circuit opinion.

In its consideration of state action, the Seventh Circuit relied on cases that analyze the extent of the powers conferred on the defendants, not the defendants' actual actions. For example, in *Wade v. Byles*, 83 F.3d 902 (7th Cir.1996), the court considered the extent of the defendant-guards' authority to act. Specifically, the guards, who were posted at Chicago Housing Authority ("CHA") residences, had the authority to carry a handgun, arrest people for criminal trespass pending the arrival of the police, and use deadly force only in self-defense. The court noted, however, that the CHA strictly circumscribed the area in which the guards could perform their responsibilities, *i.e.* only in the lobby of CHA properties. Moreover, the guards could not participate in "sweep" searches of CHA residential units conducted by the CHA police department. Because the court found that the powers of the guards were "local in nature and limited in scope," it held that there was no state action. *Id.* at 904, 907.

The Seventh Circuit opinion also considered *United States v. Hoffman*, 498 F.2d 879 (7th Cir.1974), which held that the defendants, who were both privately employed railroad policemen and Chicago special police officers, had acted under color of state law when they brutally beat vagrant trespassers. In reaching its conclusion, *Hoffman* relied on the fact that "the defendants were granted all of the same powers and duties as regular city police officers by the relevant authorizing legislation," and that the defendants were acting under a "continuing delegation of police power." *Payton*, 184 F.3d at 628 (citing *Hoffman*, 498 F.2d at 881). Although recognizing that *Hoffman* relied on the defendants' designation as railroad police officers (previously defined as state actors), the *Payton* court still found that *Hoffman* weighed heavily in Payton's favor, because the *Payton* guards "appear to have roughly the same power as [the] railroad police" in *Hoffman*. *Payton*, 184 F.3d at 629. Again, the court focused on

the powers and duties granted to the guards, not on the guards' actions.

The defendant-guards in this case have not offered any evidence that their authority as "special police," with all "the powers of the regular police patrol" at their assigned location, were circumscribed. Special Policeman and Security Guards Ordinance of the City of Chicago ("Ordinance") §§ 4–340–010 & 100. The excerpts of Rush's policies for its security guards provided to us by the parties do not indicate that the guards' authority to act was significantly circumscribed.[3] Indeed, the policies submitted to the Court indicate that the guards' responsibilities were not circumscribed at all by Rush. Thus, the defendants have not presented evidence that the guards are not state actors and summary judgment is denied on this issue.

## III. Qualified Immunity

■ We begin our analysis of qualified immunity with a brief description of the parties in this case. Rush Medical Center is a non-profit hospital which employs private security personnel, including the individual defendants in this case, Freeman and Murray. Under a Chicago Ordinance, these security guards must be licensed as "special police" and are subject to all the rules and regulations governing City of Chicago police officers. Ordinance §§ 4–

340–010 & 100. The Supreme Court, in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), established that government officials performing discretionary functions are immune from damages as long as their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known" when they acted. When the defendant is a private actor, however, a court must first determine whether qualified immunity is even available to the defendant. Whether a private actor is entitled to assert qualified immunity is governed by the two-part test articulated in *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). *Richardson* held that prison guards working for a private contractor engaged by Tennessee state to manage its prisons were not entitled to claim qualified immunity. Under *Richardson,* to determine whether a defendant has immunity, courts should consider (1) whether history reveals a "firmly rooted" tradition of immunity for the type of private actors in the case; and (2) whether the qualified immunity doctrine's purposes warrant immunity for this type of private actor. *Id.* at 404, 117 S.Ct. 2100.

Payton first argues that private police historically could not assert immunity. Evidence regarding *private* police, howev-

**3.** Rush's policy regarding Access Control, in effect on March 14, 1995, provided that:

It is the policy of the Security Services that human access into the Medical Center buildings and grounds be either controlled or monitored whenever possible ... To accomplish access monitoring and control Security workers will perform the following functions:
1. Being observant and challenging all suspicious persons ...
4. By promptly responding to, and resolving, all reports of unauthorized persons that are reported within the Medical Center.
UNAUTHORIZED PERSONS: Are those who are observed, encountered or stopped either in the Medical Center, or specific areas of the Medical Center, without legitimate business or reason ...
2.1 Persons found inside the Medical Center without any legitimate business are to

be ejected from the Medical Center grounds with the following warning.
2.11 You are not to return to the Medical Center unless seeking medical attention or you may be arrested for criminal trespass. (R. 36, Defs.' Statement of Facts ¶ 7.)
Rush's policy regarding Use of Force, in effect on March 14, 1995, provided in part:
POLICY: It is department policy that in situations that require arrest, restraint or physical ejection from the Medical Center that minimal force be used. The use of unlawful, punitive or excessive force is prohibited and may result in an officer's suspension, termination or criminal prosecution depending upon the circumstances....
Freeing or thrashing offenders will be physically restrained with minimal force until handcuffs can be applied.
(*Id.* at ¶ 6.)

er, does not address whether the "special police" in this case have immunity because the special police in this case represent a hybrid public/private police force. To generalize the rule regarding private police to special police simply because they perform the same work, would be to take a "functional approach" to the immunity question. But, a "purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities." *Id.* at 409, 117 S.Ct. 2100. For their part, the defendants ignored the Seventh Circuit's instructions to "brief the factors the *Richardson* Court used in its inquiry—whether a history of immunity for private actors exists, and the public policy considerations—to answer whether or not assertion of immunity may stand." *Payton,* 184 F.3d at 631. Because neither party has provided any relevant historical evidence regarding immunity conferred on special police, and our own analysis has not uncovered any, we go on to consider the second *Richardson* factor, policy.

■ The *Richardson* Court raised three policy considerations regarding whether a party may assert immunity: (1) protecting against timidity; (2) ensuring qualified candidates are not deterred from public service; and (3) preventing distraction from lawsuits. *Richardson,* 521 U.S. at 409–11, 117 S.Ct. 2100. The first of these considerations, protecting against timidity, is the most important to the determination of whether immunity is available. *Id.* at 409, 117 S.Ct. 2100. In *Richardson,* the Court explained that "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'non-arduous' employee job performance." *Id.* at 410, 117 S.Ct. 2100. The Court reasoned that a private company with overly aggressive guards would face damages that would raise costs, thereby threatening its replacement. Conversely, a company with overly timid guards would be threatened with replacement by other companies with safer and more effective job records. The defendants in the instant case argue

that *Richardson* can be distinguished from *Payton* because, in *Payton,* the hospital is not subject to such competitive market pressures. This argument fails.

■ Ordinary marketplace pressures are present in this case as they were in *Richardson.* First, the behavior of not-for-profit hospitals is similar to that of for-profits: "[w]hile the former does not legally earn a profit for shareholders, it does attempt to maximize fund balances and other measures of economic health." Troyen A. Brennan, *Symposium: Implementing U.S. Health Care Reform,* 19 Am. J.L. & Med. 37, 74 (1993); *see also* Marc A. Rodwin, *Strains in the Fiduciary Metaphor: Divided Physician Loyalties and Obligations in a Changing Health Care System,* 21 Am. J.L. & Med. 241, 253 (1995) ("For-profit hospitals need to promote a return for their shareholders and not-for-profit hospitals which have to compete with for-profit hospitals are often forced to adopt similar financial policies."). In this case, as in *Richardson,* the hospital's motivation to be "profitable" provides the incentive to avoid employing guards who do not perform their jobs adequately or responsibly.

In addition, the hospital itself independently employs and supervises the special police in this case "with relatively less ongoing direct [government] supervision." *Richardson,* 521 U.S. at 410, 117 S.Ct. 2100. Rush policy requires that "all new employees hired as security officers must successfully complete: 80 hours of department on-the-job training under the guidance of senior security officers and supervisors; 30, 60, 90 and 120 day probationary employee evaluations; and the International Association for Healthcare Security and Safety basic training." (R. 36, Defs.' Statement of Facts ¶ 8.) Rush also has policies on access control and the use of force by its special police officers. (*Id.* at ¶¶ 6–7.) In this case, government supervision is minimal. The Chicago Ordinance does not require Rush to employ special police at all. Instead, the Ordinance mere-

ly requires that, should Rush choose to have a security force, those security personnel must be licensed as special policemen and abide by the rules and regulations governing police officers in Chicago. (Pl.'s Statement of Additional Facts, ¶ 23.) Because the government only sets policy and has limited direct supervision ·in this case, the defendants are not entitled to qualified immunity. *See Ace Beverage Co. v. Lockheed Info. Management Servs.*, 144 F.3d 1218, 1220 (9th Cir.1998) (limited direct government supervision, such as setting policy and monitoring performance, is inadequate to confer qualified immunity).

Furthermore, Rush has insurance .to cover such incidents as the one at issue in this case, a factor which the *Richardson* Court found weighed against finding that the prison guards had immunity. *Richardson*, 521 U.S. at 410, 117 S.Ct. 2100. Given that the hospital is subject to competitive market pressures, little or no direct government supervision and has insurance, we cannot find any special immunity-related need to encourage effective and responsible performance by the special police in this case.[4] *See id.*

In addition to mitigating unwarranted timidity, the *Richardson* Court considered a second policy goal: ensuring that qualified candidates are not deterred from public service. The Court reasoned that quali-

fied. immunity for the private prison guards was not required because their employer had insurance, which increased the likelihood of employee indemnification. ·In addition, the *Richardson* Court pointed out that private firms, because they are free from many civil service law restraints, can "offset any increased employee liability risk with·higher pay or extra benefits." *Richardson*, 521 U.S. at 411, 117 S.Ct. 2100. Similarly, in this case, Rush has insurance to cover these types of events and has control over the salaries and benefits paid to their security guards. Thus, this second policy consideration also weighs against finding immunity for the defendants.

The *Richardson* Court downplayed the third and last policy consideration, distraction from potential lawsuits, stating that "the risk of distraction alone is insufficient grounds for an immunity." *Id.* Thus, because the first two policy considerations do not support an immunity claim, we need not analyze the final policy factor.

Finally, we recognize that the context of this case is not identical to *Richardson*: *Richardson* involved "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution), with limited direct supervision by the government, [which un-

---

**4.** The defendants point us to *Raby v. Baptist Medical Center*, 21 F.Supp.2d 1341 (M.D.Ala. 1998), in which an Alabama district court held that the private hospital's security guards in that case were entitled to qualified immunity. The *Raby* court examined the historical precedent for conferring immunity on *public* police but expressed uncertainty as to "[w]hether or not [this] historical evidence of immunities for police officers 'fits the first *Richardson* prong." *Id.* at 1356. The *Raby* court went on to consider the second *Richardson* prong and determined that the defendant-hospital was not subject to the competitive pressures identified in *Richardson*. Thus, it held that the defendants were entitled to immunity.

We are not persuaded by *Raby*. First, as explained above, we decline to take a functional approach to the immunity question and therefore are not persuaded by historical pre-

cedent that *public* police have been granted immunity. In addition, we respectfully disagree that hospitals, in the age of managed care, do not operate in a competitive marketplace.

In addition, the defendants cite, without argument, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir.1998), for the proposition that the defendants in this case served as adjuncts to the government, and therefore are entitled to immunity. In *Pani*, the defendants were "fiscal intermediaries and carriers [who] operate[d] under not-for-profit contracts with the federal government." *Id.* at 74. Because the defendants in the instant case had no such contracts with the government, *Pani* is easily distinguished. Payton advances no other basis for finding that the guards in this case served as adjuncts to the government.

dertook] that task for profit and potentially in competition with other firms." *Id.* at 413, 117 S.Ct. 2100. The distinguishing fact in this case is that the defendants are not organized to assume a major administrative task for the government. Contrary to the defendants' contention, that difference weighs strongly against them. The presumption is against immunity for private actors unless tradition and strong policy reasons dictate conferring immunity. *See id.* at 403, 117 S.Ct. 2100 (quoting *Wyatt v. Cole,* 504 U.S. 158, 163–64, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (Although "Section 1983 creates a species of tort liability that on its face admits of no immunities," the Court has nonetheless accorded immunity where tradition and policy reasons dictate that result.)). If the *Richardson* defendants could not overcome the presumption against immunity, then *a fortiori,* the *Payton* defendants cannot. Therefore, we find that these defendants are not entitled to qualified immunity.

## IV. Payton's Due Process Claim

### A. Probable Cause

■■ To avert summary judgment on his unlawful arrest and false imprisonment claims, Payton must establish a triable issue that the defendants arrested him without probable cause. *Jones by Jones v. Webb,* 45 F.3d 178, 181 (7th Cir.1995); *Schertz v. Waupaca County,* 875 F.2d 578, 582 (7th Cir.1989) ("[T]he existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution."). Even malicious motives will not support a claim of false arrest if probable cause exists. *Fernandez v. Perez,* 937 F.2d 368, 371 (7th Cir.1991). Probable cause for an arrest exists if, at the time of the arrest, the facts and circumstances within the police officer's knowl-

edge were sufficient to warrant a reasonable belief that the suspect had committed, or was committing an offense. *Qian v. Kautz,* 168 F.3d 949, 953 (7th Cir.1999). Although the issue of probable cause to arrest generally is a jury question, "the court appropriately may conclude that probable cause existed as a matter of law when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Booker v. Ward,* 94 F.3d 1052, 1058 (7th Cir.1996) (quotations omitted).

■■ The defendants argue that they had reasonable suspicion to conduct an investigative stop and that, once Payton tried to leave the scene, they had probable cause to arrest him. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (an officer can conduct a brief investigatory stop when he has a reasonable, articulable suspicion that criminal activity is afoot). Under *People v. Ware,* 264 Ill. App.3d 650, 201 Ill.Dec. 575, 636 N.E.2d 1007, 1009 (1994), "police must identify specific articulable facts which, when taken together with natural inferences" make an investigative stop reasonable. We find that the guards' investigative stop of Payton was justified. At the point the guards first attempted to stop Payton, as he was walking toward the financial department, at least one of the guards, Freeman, knew that two hospital employees wanted Payton to be restrained from entering that area because they were concerned about a possible "upheaval." (R. 44–1, Pl.'s Response to Defs.' Statement of Facts ¶ 34b.) In addition, Freeman knew that Calvin had filled out a police report on Payton complaining of his threatening behavior toward her. These facts provide the articulable facts necessary to justify a *Terry* stop.[5]

---

5. The defendants, in their reply brief, rely on *Illinois v. Wardlow,* —— U.S. ——, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), which held that flight from police officers, in some circumstances, can provide reasonable suspicion to justify a stop, to further support their argument that the guards in this case had reasonable suspicion to stop Payton. *Wardlow* does not guide our analysis because, in this case, Payton's flight occurred *after* the guards already had reasonable suspicion to stop him.

Further, when Payton defied the guards' orders to stop and instead tried to exit the building, they had probable cause to arrest him. Flight from an investigative *Terry* stop provides probable cause to arrest the suspect. *Tom v. Voida,* 963 F.2d 952, 959 (7th Cir.1992). Although Payton quibbles with the characterization of his attempt to leave the building as "flight," it remains undisputed that he attempted to get away from the defendants even after they asked him to stop. This attempt to leave the scene was sufficient to escalate the guards' reasonable suspicion into probable cause.

Because there is no question that the guards had reasonable suspicion to stop Payton and then probable cause to arrest, Payton cannot, as a matter of law, succeed on his unlawful arrest and false imprisonment claims. Thus, we grant summary judgment to defendants on these claims.

## B. Excessive Force

An excessive force claim requires an inquiry into whether the defendants' actions were objectively reasonable in light of the totality of the circumstances confronting them, without regard to subjective intent or motivation. *See Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 592 (7th Cir.1997). Factors to be considered include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* In this case, there is a genuine issue of material fact regarding Payton's excessive force claim. Payton's version of the facts is as follows: he was attempting to leave the hospital in a peaceful manner when both Freeman and Murray grabbed his shoulders, his jacket, and his hands to prevent him from leaving the building. Then the guards allegedly lifted his feet into the air and threw him down to the ground, where his head smacked the floor. Payton screamed, "You're hurting me"; then all three men went down to the floor. One or both guards then repeatedly slammed Payton's head against the floor. According to Payton, he then lost consciousness. Payton complains that, as a result of this altercation, he got abrasions on his forehead, scratch marks on his face, an abrasion above his eyebrow, and pain in his arms, back and knees and required medical treatment for about three months.

The guards' account differs substantially. Although the defendants agree that they grabbed Payton's jacket when he failed to stop as requested, they assert that Payton kicked out at the guards and that Payton hit his head on the floor when he was trying to get away. They claim that they simply were trying to get Payton to cooperate with them. The two versions of the facts given by the parties in this case establish that there is a genuine issue of material fact. *See Dorsey.v. St. Joseph County Jail Officials,* 98 F.3d 1527, 1529–30 (7th Cir.1996) ("The credibility dispute presented by these divergent accounts cannot ... be decided on summary judgment."). Thus, we deny summary judgment on Payton's excessive force claim.

## V. Liability of Rush and Blair

Payton argues that Rush and Blair should be held responsible for promulgating and enforcing a policy that encouraged its security officers to violate his constitutional rights. Payton focuses on Rush's policy of ejecting "[p]ersons found inside the Medical Center without any legitimate business." (R. 43, Pl.'s Response at 21.) Payton argues that, because the policy does not define "legitimate business," Rush encourages its special police to make unlawful arrests and use excessive force on individuals. This bald assertion, however, is insufficient to show that Rush and Blair should be held accountable for the alleged violation of his rights. Payton has not presented evidence of any other incidents of similar misconduct with respect to any other individuals at the hand of Rush's special police or that a Rush policy or custom caused the special police to engage in illegal behavior. In fact,

Rush's policy regarding its guards' use of force explicitly requires that, "in situations that require arrest, restraint, or physical ejection from the Medical Center ... *minimal* force be used." (R. 36, Defs.' Statement of Facts ¶ 6 (emphasis added).) Payton cannot rest on mere allegations of unconstitutional policies or customs to defeat summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Payton has not established a genuine issue of material fact on his policy claim against Rush.

We also grant summary judgment in favor of Blair. Blair was not named as a defendant in any of Payton's federal law claims. *See Payton,* 184 F.3d at 624 n. 1. Even if Payton had properly named Blair, because we have found that Rush did not have a policy or custom which caused the Rush guards to violate individual's constitutional rights, we cannot find that Blair, as an "agent of Rush," was responsible for carrying out any such policy. (R. 43, Pl.'s Response at 20.)

## VI. State Law Claims

### A. Assault and Battery

For the same reasons we found that Payton established a genuine issue of fact precluding summary judgment on the federal excessive force claim, we cannot grant summary judgment on his state assault and battery claim.

### B. False Imprisonment

Because we found that there was probable cause for Payton's arrest, we must grant the defendants' summary judgment motion on Payton's state false imprisonment claim.

### C. Malicious Prosecution

 Under Illinois law, the existence of probable cause is an absolute bar to a malicious prosecution claim. *Cervantes v. Jones,* 188 F.3d 805, 810–11 (7th Cir.1999) ("The existence of probable cause for the prosecution is a complete defense to an action for malicious prosecution under both Illinois and federal law."). Because the guards had probable cause to arrest Pay-

ton, he cannot possibly succeed on this claim and we grant summary judgment to the defendants.

### D. Abuse of Process

 Two elements are required for an abuse of process claim: (1) "an ulterior purpose or motive; and (2)[s]ome act in the use of the legal process not proper in the regular prosecution of the proceedings." *Holiday Magic, Inc. v. Scott,* 4 Ill.App.3d 962, 282 N.E.2d 452, 455 (1972). Payton has not advanced any evidence to support the bare allegations, made in his second amended complaint, that the defendants had an ulterior motive to institute proceedings against him. (Pl.'s Second Am. Compl. ¶ 39.) Because Payton has not gone beyond these bare allegations to identify a genuine issue for trial, we grant summary judgment to the defendants on Payton's abuse of process claim.

## CONCLUSION

For the foregoing reasons, we grant summary judgment in favor of Rush and Blair on all counts. (R. 33.) In addition, we grant summary judgment in favor of Freeman and Murray on the federal claims of unlawful arrest and false imprisonment and on the state claims of false imprisonment, malicious prosecution, and abuse of process. (*Id.*) We deny Freeman and Murray's motion for summary judgment on Payton's federal claim of excessive force and his state assault and battery claims. These claims, together with the pending counterclaim will proceed to trial on February 28, 2000. A Final Pretrial Order, which is consistent with this opinion, should be filed on or before February 14, 2000. The Court will hold a status hearing on February 16, 2000 at 9:30 a.m. in open court to address any matters which will facilitate a fair and efficient trial.