# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2339

PAMELA JOHNSON,

*Plaintiff-Appellant,*

v.

LARABIDA CHILDREN'S HOSPITAL,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01-C-1047—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED JANUARY 15, 2004—DECIDED JUNE 22, 2004

———————

Before COFFEY, KANNE, and EVANS, *Circuit Judges.*

COFFEY, *Circuit Judge.* Plaintiff-appellant Pamela Johnson brought suit against her former employer, LaRabida Children's hospital in Chicago, Illinois, alleging that her civil rights had been violated, pursuant to 42 U.S.C. § 1983, when she was struck in the head by security guard Tommy Stephens while attempting to gain access to the facility. The district court granted LaRabida's motion for summary judgment under Fed. R. Civ. P. 56(c), finding Johnson had failed to provide sufficient proof to demonstrate that Stephens was a state actor within the meaning of § 1983. We affirm.

## I.  BACKGROUND

On March 23, 1999, plaintiff-appellant Pamela Johnson ("Johnson") entered the lobby of her former employer, the LaRabida Children's Hospital ("Hospital") to discuss a negative recommendation a potential employer allegedly received from LaRabida while she applying for a new job. The stated purpose of her visit to the hospital that day was to review her personnel file with the director of the human resource department, Bill Koulias ("Koulias"). Upon arrival, Johnson requested access to the human resources department and Koulias, but her request was denied by the Hospital's receptionist, Willie Williams ("Williams"). At this point, Johnson began to threaten Williams, allegedly screaming "Call the police [explicative] because I am going to kill you!" R.22, Williams Affidavit ¶ 1. This prompted Williams to again deny Johnson's requested audience with Koulias and place a call to Hospital security. Prior to security arriving Johnson continued her tirade, allegedly threatening to beat and kill Williams and Koulias.

When security guard Tommy Stephens ("Stephens") arrived on the scene, in the midst of Johnson's ranting, he directed Williams to call 911. Stephens also told Johnson that she would not be allowed to go up to the human resource department to see Koulias. Johnson responded by asking whether Stephens had a gun. When Stephens told her that he did not, Johnson warned Stephens that he would need to find some people with guns to stop her. According to Stephens and Williams, Johnson claimed to have a gun. R.22, Williams Affidavit ¶ 1; R.22, Stephens Affidavit ¶¶ 1, 2.

As Johnson became more enraged, she attempted to walk around Stephens and proceed to the human resource department. Stephens grabbed Johnson to impede her advance and was subsequently kicked in the leg. Stephens responded by screaming out "that bitch kicked me." Johnson

Affidavit ¶ 2. Then, in an attempt to prevent Johnson from possibly doing harm to herself or others, Stephens, using a downward motion, struck Johnson in the head with the walkie-talkie he was holding in his left hand. It was only after Stephens struck Johnson that her verbal and physical barrage ceased and she left the Hospital's lobby, where she was met at the door by Chicago police called to the scene by Williams. Police took Johnson to a local hospital where she received 13 stitches for her wound. While neither Johnson nor Stephens were arrested the day of the incident, Johnson was issued a citation for assault, battery, and disorderly conduct.

Although Johnson filed criminal battery charges against Stephens, the State's Attorney's Office elected not to pursue charges. Subsequently, Stephens, Koulias, and two other Hospital employees prepared and signed misdemeanor criminal complaints against Johnson alleging disorderly conduct, telephone harassment, assault, and battery.[1] The assault and battery charges were dismissed on April 4, 2000 and never reinstated. In return for the dismissal of those charges, Johnson pled guilty to the misdemeanor disorderly conduct and telephone harassment charges. She was sentenced to, and completed, one year of conditional supervision. In her plea agreement, Johnson admitted that she (1) acted in "an unreasonable manner"; (2) "threat[ened] bodily harm" to persons at the Hospital; (3) "provoke[d] a breach of the peace"; (4) "battered [Stephens]"; and (5) "created dismay."

On February 15, 2000, Johnson filed a civil complaint, pursuant to 28 U.S.C. § 1983, against the Hospital and Stephens alleging that they violated her civil rights because

---

[1] After the incident, Johnson continued to threaten bodily harm to various Hospital personnel in numerous recorded telephone calls made to the Hospital.

Stephens used excessive force when he struck her in the head. Johnson's complaint also alleged a number of pendant state law claims. On January 24, 2002, the defendants filed a motion for summary judgment on Johnson's Section 1983 claim. On September 27, 2002, the trial judge granted the defendant's motion, dismissing both Johnson's federal and pendant state law claims. Specifically, the district court found that Stephens was not a "state actor" for purposes of Section 1983. The judge's Order also declined to retain pendant jurisdiction over Johnson's state law claims. Johnson timely appealed the Order to this Court on October 16, 2002. We affirm.

## II. ANALYSIS

"We review a district court's grant of summary judgment de novo, construing all facts and inferences in the light most favorable to the non-moving party." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1028 (7th Cir. 2004). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

42 U.S.C. § 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. While generally employed against government officers, the language of § 1983 authorizes its use against private individuals who exercise government power; that is, those individuals who act "under color of state law." *Payton v.*

*Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 628 (7th Cir. 1999). This Court held in *Payton v. Rush-Presbyterian-St. Luke's Medical Center* that a private party will be deemed to have acted under "color of state law" when the state either (1) "effectively directs or controls the actions of the private party such that the state can be held responsible for the private party's decision"; or (2) "delegates a public function to a private entity." *Id.* Johnson argues, in accord with the latter theory, that Stephens should be considered a state actor due to his status as a special policeman, duly appointed under Chicago Municipal Code § 4-340-100.[2]

Chicago Municipal Code § 4-340-100 declares that "[s]pecial policemen shall possess the powers of the regular police patrol at the places for which they are respectively appointed." Furthermore, "for purposes of determining whether [an individual is a] state actor[ ] . . . , no legal difference exists between a privately employed special officer *with full police powers* and a regular Chicago police officer. *Payton*, 184 F.3d at 630 (emphasis added). If, however, the privately employed special officers are "no substitute for the police" in that they are not "entrusted with all powers possessed by the police," then the special officer is not considered a state actor. *Id.* (citations omitted). When, for example, a special officer's only recourse in a given situation is to call the police for help, it is "a far cry from delegating all of the powers of the regular police patrol to the special officer." *Payton*, 184 F.3d at 630.

---

[2] While Chicago Municipal Code § 4-340-100 also requires "[s]pecial policemen [to] report to the superintendent of police . . . as . . . required by him," and thus creates the potential for a claim of state action under the "directs or controls" prong, *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 184 F.3d 623, 628 (7th Cir. 1999), Johnson does not offer that argument before this Court.

In *United States v. Hoffman*, 498 F.2d 879 (7th Cir. 1974), for example, we held that privately employed railroad policemen, who were also Chicago special police officers, were state actors when they brutally beat vagrant trespassers. *Id.* at 881-82. Of particular importance was the fact that the policemen were "authorized on a continuing and full-time basis to search actively for criminals and . . . to use the powers of the state when their search [was] successful." *Id.* at 881.

In *Wade v. Byles*, on the other hand, we held that a security guard working under contract with the Chicago Housing Authority ("CHA") was not a state actor when, while on duty, the security guard got into an altercation with an individual at a CHA security checkpoint, and shot the man in the groin. 83 F.3d 902 (7th Cir. 1996). Like the railroad policemen in *Hoffman*, the CHA had been officially delegated police authority. *Id.* at 903. Unlike the situation in *Hoffman*, however, we held that *Wade* was not a case "where the state ha[d] delegated its entire police power to a private police force." *Id.* at 905 (Although contract with CHA allowed guard to carry gun, it only permitted him to detain individuals for trespass and only pending arrival of police). For that reason, the guard in *Wade* was not a state actor. *Id.* at 907.

Under this standard, the district court did not err in finding that Stephens was not a state actor. Initially, it should be noted that Stephens did not, and was not authorized to, carry a firearm. Also, at the time of the incident, Stephens was not expected or authorized to carry out the functions of a police officer. Stephens was merely responsible for routine security duties only such as patrolling the interior and exterior of the hospital, observing potential safety hazards, manning an information desk, monitoring the alarm system, and providing escorts for patients and staff. In the event that a visitor to the hospital were to

become unruly or disruptive, as Johnson clearly did, it was within Stephen's discretion to ask that person to leave the premises. However, per Hospital policy, when Johnson began acting belligerent and hostile and refused to leave, the only recourse Stephens had was "to call 911 for assistance in having the individual removed." Defendant's Motion for Summary Judgment, Ex. 11, at L00001. This is "a far cry from delegating all of the powers of the regular police patrol to . . . special officer [Stephens]."

Indeed, Stephens precisely followed this procedure on March 23, 1999. For when Stephens arrived on the scene (after responding to an assistance call from Williams) and perceived the threat that Johnson posed, he immediately directed Williams to dial 911. It was only after Stephens had been physically assaulted by Johnson, and legitimately feared for his safety and the safety of others present,[3] that he used force to subdue Johnson, striking her once in the head with the only "weapon" he had, his walkie-talkie. Much like *Wade*, therefore, this is not a case "where the state ha[d] delegated its entire police power to a private police force." *Id.* at 905. Stephens was no substitute for the police and, therefore, not a state actor. *Payton*, 184 F.3d at 630.

Nonetheless, assuming *arguendo*, that Stephens was a state actor, Johnson would still need to establish that Stephens deprived her of a constitutional right. 42 U.S.C. § 1983. She cannot do so. In her complaint, Johnson claims

---

[3] As noted above, Johnson allegedly implied she was in possession of a firearm. Stephens states in his affidavit that "I became very concerned that Johnson would pull the gun she had been repeatedly threatening to use . . . [and] [d]etermined not to become the latest victim of a disgruntled former employee's shooting spree, I instinctively reacted by striking Johnson in the forehead . . . ."

that Stephens used excessive force in seeking to detain her in violation of the Fourth Amendment. We disagree. Stephens' use of force was reasonable as a matter of necessity and law.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. M.S. Connor*, 490 U.S. 386, 396 (1989). Furthermore, it is clear that, under the Fourth Amendment, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion." *Id.* What is reasonable depends upon the particulars of a given case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* In addition, what is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Under this standard, it is clear that Stephens exercised reasonable force in attempting to detain Johnson. By her own admission, Johnson (1) acted in "an unreasonable manner"; (2) "threat[ened] bodily harm" to persons at the Hospital; (3) "provoke[d] a breach of the peace"; (4) "battered [Stephens]"; and (5) "created dismay." These admissions alone demonstrate that Stephens had reason to exercise physical coercion and that the single blow from his walkie-talkie was reasonable force given the situation. *Id.* As such, even if we were to hold that Stephens was a state actor, he did not deprive Johnson of her Fourth Amendment right to be free from excessive force.

## III.  Conclusion

The judgment of the district court is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*